# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

LARRY DONALD JOHNSON,

     **Plaintiff,**

v.                                                     **Case No. 3:13cv49/CJK**

MICHAEL J. ASTRUE,
**Commissioner of Social Security,**

     **Defendant.**

_____/

## MEMORANDUM ORDER

This case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Larry Donald Johnson's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34, and Supplemental Security Income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-83. The parties have consented to Magistrate Judge jurisdiction, pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73, for all proceedings in this case, including entry of final judgment. Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner, therefore, will be affirmed.

PROCEDURAL HISTORY

Plaintiff, who will be referred to as claimant, plaintiff, or by name, raises two issues. He first claims that the Administrative Law Judge ("ALJ") erred by failing to provide good cause for according little weight to the "opinions of plaintiff's treating physicians." (Doc. 11, p. 6). This point focuses upon a report provided by Dr. Lokaranjit Chalasani, a psychiatrist. Under the second point, plaintiff argues that the ALJ's formulation of Residual Functional Capacity ("RFC") is not supported by substantial evidence. Plaintiff urges that the ALJ erred by determining that he could return to his past work as a kitchen helper. (Doc. 11, p. 9). This order will provide facts as relevant to analysis of each issue based upon my independent review of the record.

STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said that "'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (quoting *Lewis*, 125 F.3d at 1439).

Although the ALJ's decision need not be supported by a preponderance of the evidence, therefore, "it cannot stand with a 'mere scintilla' of support." *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Moreover, the reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d. 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[1]

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[2] 42 U.S.C.

---

[1] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 11th Cir. 2002).

[2] As indicated above, claimant is seeking both DIB and SSI. For purposes of determining whether a claimant is disabled, the law and regulations governing a claim for DIB are identical to those governing a claim for SSI. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986). All

§ 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work, "but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A)

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2.  If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.  If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.  Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  *See* 20 C.F.R. § 404.1512. *Chester v.  Bowen*, 792 F.2d 129, 131 (11th Cir.  1986).

---

references to statutes and rules in this order will be to those addressing DIB.

The Eleventh Circuit has explained the operation of step five. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ('The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act')).").

Step five (or step four in cases such as the present one where the ALJ decides a claimant can perform past work) is where the issues often are framed. At that point, the ALJ formulates the all-important residual functional capacity. Even where one or more severe impairments are established, the claimant must show that he cannot perform work within that residual functional capacity. The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain). Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[3] "[R]esidual functional

---

[3] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps." 20 C.F.R. § 404.1520(a)(4).

capacity is the most [claimant] can still do despite [claimant's] limitations."[4] 20 CFR § 404.1545(a)(1). Often both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

In the first point raised on review, claimant advances a two-page report entitled "Supplemental Questionnaire As To Residual Functional Capacity." ("Supplemental Questionnaire"). T. 419-420. In this document, Dr. Chalasani circled or checked off preprinted answers to eleven questions, some with sub-parts. The report contains one handwritten notation having to do with the effects of certain medications. Question number twelve, entitled "Additional Comments," prompted no response by Dr. Chalasani. Mr. Johnson finds several of the conclusions in this report important and disagrees with the ALJ's decision to afford those conclusions little weight. By circling responses, Dr. Chalasani reported constant estimated deficiencies in

---

[4] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity. We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (See § 404.1512(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons. (See paragraph (e) of this section and § 404.1529.)[.] 20 C.F.R. § 404.1545(a)(3).

concentration, persistence or pace. He found marked episodes of "deterioration or decompensation" in work or work-like settings. He noted moderate limitations in claimant's ability to understand, carry out, and remember instructions in a work setting, marked limitations in ability to respond appropriately to supervision in a work setting, and moderate limitation in ability to perform repetitive tasks in a work setting. The ALJ afforded little weight to the foregoing conclusions, reasoning:

> Dr. Chalasani's assessments are inconsistent with corresponding treatment records. The clinical findings illustrate a significantly higher level of functioning. Treatment records reflect improvement in the claimant's condition, including progressively higher GAF scores through the relevant period. These scores have remained in the range indicative of moderate limitations in functioning. The psychiatric opinion evidence provided by the claimant's treating source, Dr. Chalasani, is afforded little weight due to numerous inconsistencies with Dr. Chalasani's own treatment records.

T. 22.[5]

Without dispute, Dr. Chalasani is a treating physician in this case. Thus, the issue, as phrased, implicates the treating physician rules. Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997);

---

[5] A GAF between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). However, the most recent edition of the Diagnostic and Statistical Manual no longer recommends use of the GAF scale, acknowledging that "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

*Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ will give it controlling weight. 20 C.F.R. § 404.1527(c)(2).[6] Where a treating physician has merely made conclusory

---

[6] The cited regulation embodies the treating physician rule:

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion

statements, however, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of the claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987).

The law concerning conclusory statements is particularly applied where a doctor, even one who has treated the claimant, expresses opinions on a preprinted or "check-off" form. Such opinion evidence will not bind the Commissioner. Indeed, courts have found that such preprinted forms do not provide persuasive evidence of the validity of the opinions expressed therein. *See Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("Check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions." (*citing Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993))). Although such forms certainly are admissible, "they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole." *O'Leary v. Schweiker*, 710 F. 2d 1334, 1341 (8th Cir. 1983).

---

more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

These pronouncements suggest that where a party wishes to rely upon opinions expressed in a check-off form, that party would be well-served to scour the record for actual, supportive medical evidence, consistent with the short-hand conclusions.  The absence of such medical evidence may weaken or obliterate the probative value of the form.  Here, the ALJ specifically found that the form in question differed from the observations recorded in Dr. Chalasani's treatment records.

Dr. Chalasani works as a psychiatrist for Lakeview Center, Inc., a Pensacola facility that treats and manages mental and emotional disorders, such as those that afflict plaintiff.[7]  Claimant underwent group therapy at Lakeview and saw Dr. Chalasani for diagnosis, treatment plan, and medication.  During a visit on August 8, 2009, claimant reported stress relating to his application for SSI.  T. 389.  He had a history of janitorial work, but left because of "dealing with chemicals."  T. 389.  He continued to maintain "treatment gains."  T. 389.  Claimant was well groomed and well spoken.  His mood was "less irritable."  T. 389.  He had goal oriented thought process, fair cognitive ability, and fair insight and judgment.  T. 389.  Mr. Johnson understood the treatment plan as described by Dr. Chalasani.  T. 389.

In November, 2009, plaintiff saw Dr. Chalasani for medication management.  T. 388.  During that visit, plaintiff offered he was "doing much better" on his medication and denied any side effects.  T. 388.  He was alert, calm, and cooperative.  Thought was goal directed and affect was mood congruent and bright.  T. 388.

Upon examination on November 24, 2009, Dr. Chalasani noted claimant was maintaining treatment gains and tolerating his medication well.  T. 387.  Claimant

---

[7]Relevant to this appeal, the ALJ determined that Mr. Johnson has a severe impairment of "major depressive disorder."  T. 14-15.

was alert and oriented. He was calm and cooperative, well-dressed, and well-groomed. He displayed "goal directed" thought process, with fair cognitive ability and fair insight and judgment. T. 387.

In February 2010, Dr. Chalasani completed a Treating Source Mental status Report for the state agency. T. 390-392. This report required the doctor to answer specific questions. As in the exam notes, Dr. Chalasani said claimant was goal directed with no overt psychotic symptoms. Claimant was well-oriented to person, place, and time and displayed "grossly intact" memory – immediate, recent, and remote. T. 391. He was calm and cooperative. Dr. Chalasani diagnosed major depressive disorder, mild, with no psychotic features. T. 391. Asked to address what the patient can "still do despite. . .mental impairments" and to comment on "capacity for understanding and memory, sustained concentration and persistence, social interaction, and adaption," the doctor stated simply "does comprehend." T. 392. Dr. Chalasani believed claimant could work part time, under supervision. T. 392.

On February 1, 2011, several months after completing the Supplemental Questionnaire, Dr. Chalasani saw plaintiff for medication management. T. 434. Mr. Johnson continued to maintain treatment gains and tolerate his medication. He had no hallucinations. He was alert and oriented in three spheres and was calm and cooperative. Plaintiff's mood was "euthymic."[8] His affect was bright and, as before, his thought process was goal-directed.

Based upon the foregoing, the ALJ properly found the Supplemental Questionnaire deviated from the actual treatment observations. Significantly,

---

[8]"Euthymia" connotes "a state of mental tranquility and well-being; neither depressed nor manic." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (32D ED.)

although Dr. Chalasani predicted constant deficiencies of cooperation, persistence, or pace and marked episodes of decompensation[9], nothing in the treatment chart comports with such prognosis. Even more to the point, Dr. Chalasani consistently noted a patient with goal-directed thought and no overt psychotic symptoms, who was maintaining, if not improving.

The ALJ also noted other medical evidence and treating third-party assessments of record. T. 9-11. Plaintiff's "life coach" stated he was able to "constantly" pay attention. T. 200. He followed spoken instructions "pretty good." T. 200. He did not handle stress well, but he was very respectful of authority figures. T. 201. The disability determinations office reported contact with plaintiff's therapist at Lakeview in January 2010. The therapist, Ms. Killam, said that claimant was doing "amazingly well." T. 222. He was able to concentrate on tasks and follow simple instructions. His memory was intact. T. 222.

---

[9]In psychiatry, "decompensation" means "failure of defense mechanisms resulting in progressive personality disintegration." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (32D ED.) Under the Commissioner's regulations:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).

The ALJ also noted assessments by state agency psychologists, Dr. Meyers and Dr. Carter.  T. 21.  As to Dr. Meyers, the ALJ found that claimant's limitations were actually more severe than those assessed by Dr. Meyers and therefore afforded "lesser weight" to that assessment.  T. 21.  The ALJ, however, did not discount entirely Meyers' assessment, which concluded claimant had few significant limitations in those areas germane to work activities.  T.  358-360.

The ALJ found the assessment performed by Dr. Carter to be consistent with the full record regarding claimant's limitations.  T. 21.  Dr. Carter noted a few moderate limitations, but as to the great majority of work-related functions, found no significant limitation.  T. 393-394.  Under the functional capacity assessment, Dr. Carter concluded plaintiff could understand, remember, and carry out routine instructions.  He could go out and socialize, and he could cope with routine activities and adapt to change.  T. 395.

The ALJ did not err by making reference to the state agency consultants. Under the regulations and case law, an ALJ may rely upon, and must consider, the opinions of state agency consultants.  See 20 C.F.R.  § 404.1527(e)(2); *see also Voronova v. Astrue*, 2012 WL 2384414, *4 (M.D. Fla. 2012) (acknowledging that ALJ is required to consider opinions of non-examining state agency medical and psychological consultants.).  Although not bound by such opinions, the ALJ "must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether [claimant is] disabled. . .  20 C.F.R.  § 404.1527(e)(2)(i).  When considering the findings of a state agency medical or psychological consultant, the ALJ will look to

factors "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii). The ALJ determines the weight afforded to consultants and, if the ALJ affords controlling weight to such a consultant, rather than to a treating source, the ALJ must explain the weight given to such opinion, just as with other medical sources. *Id.* The regulations provide that agency medical and psychological consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." *Id.* Acknowledging this expertise, the Eleventh Circuit has explained that, in a proper case, the ALJ does not err by giving substantial weight to the opinions of non-examining physicians, including state agency medical and psychological consultants. *See Milner v. Barnhard*, 275 Fed. Appx. 947, 948 (11th Cir. 2008).[10] Having properly afforded little weight to Dr. Chalasani's Supplemental Questionnaire, the ALJ also found appropriate support in the other source opinions discussed above.

Plaintiff next urges that the ALJ's determination that plaintiff can perform his past work as a kitchen helper lacks support in substantial evidence. Plaintiff points to the testimony of vocational expert Leslie Gillespie and argues that his "marked"

---

[10]The consultant's report alone does not constitute good cause for the ALJ to discredit treating physician opinions. *See Lamb v. Bowen*, 847 F. 2d 698*, 703. Where the ALJ does articulate good cause, however, the opinions of consultants may take on particular significance. *See Voronova* 2012 WL at *6 (explaining that the "rule" suggesting that non-examining doctors are entitled to little weight is most often stated in the face of treating physician opinions that "have not otherwise been validly discounted."). Here, as explained above, the ALJ articulated good cause by finding that Dr. Chalasani's opinions were not consistent with the doctor's chart as a whole.

limitations in ability to interact with supervisors and co-workers would preclude his returning to his past work as a kitchen helper.  Ms. Gillespie did testify, in response to a hypothetical question, that an individual with the marked limitation claimed by plaintiff would not be able to work as a kitchen helper, which is a "somewhat crowded circumstance."  T. 57.  Under this point, plaintiff also argues that the ALJ erred by failing to "obtain detailed information about the actual job duties, physical and mental demands, and requirements of Plaintiff's kitchen helper work as required by SSR 82-62."

Ms. Gillespie qualified as a vocational expert by stipulation.  T. 49.  She is familiar with the definitions used by the Commissioner for various levels of work–unskilled, semi-skilled, skilled, sedentary, light, medium, heavy, and very heavy.  T. 49.  Gillespie identified kitchen helper as work claimant had performed within the last fifteen years.  T. 49-50.  She described the level of skill and exertion required for that position.  T. 50.  Claimant confirmed he had once worked full-time as a kitchen helper.  T. 54.

The ALJ posed a number of hypothetical situations to Ms. Gillespie.  As to the first hypothetical individual described by the ALJ, the potential worker would have a number of limitations related to psychological and emotional factors: he would be able to understand, remember, and carry out simple routine tasks but not complex or detailed tasks; he should interact or communicate with the public on not more than an occasional basis; and he would have mild to moderate impairment in terms of concentration, persistence, or pace (defined by the ALJ as "being off task or at a non-productive pace for up to five percent of the work day.").  T. 54-55.  Gillespie identified kitchen helper as the claimant's only past work consistent with such

limitations.  T. 55.

The ALJ then described a similar hypothetical worker but with "more of a marked impairment in terms of concentration, persistence, or pace, which [the ALJ] would define as sufficient to cause the individual to be off task for up to fifteen to twenty percent of the work day."  T. 56.  Gillespie testified that she could not identify an occupation that such a person could sustain on a full-time basis.  T. 56.

The ALJ proceeded to describe a potential worker who had a "marked impairment in terms of his ability to respond appropriately to supervision and coworkers" and who would need a job "pretty much in isolation."  T. 56.  Ms. Gillespie concluded that such a person could not work as a kitchen helper because "those jobs generally are going to be in a somewhat crowded circumstance. . ." T. 57. She went on to observe that unskilled work would generally be performed in a setting that includes other workers.  T. 57.  She affirmed that her opinions were consistent with the Dictionary of Occupational Titles.  T. 58.

Claimant's lawyer then asked Ms. Gillespie to consider Dr. Chalasani's Supplemental Questionnaire, described above.   Given the marked impairments circled by Dr. Chalasani on the form, Gillespie could not identify any work that such an individual could sustain.  T. 58-59.

The present point on review, just like the individual described by claimant's lawyer, depends on whether the Supplemental Questionnaire accurately portrayed the plaintiff's vocational limitations.  As set out above, the ALJ did not err by rejecting the conclusory opinions proffered by Dr. Chalasani.  Specifically, and in contrast to those conclusory opinions, the record shows that plaintiff was able to pay attention and follow instructions.  T. 200-201.  He was alert and attentive in a group setting.

T. 491. He was able to interact well with peers and staff at the Lakeview facility. T. 494. Even after completing the form that takes on so much significance to the present argument, Dr. Chalasani noted that Mr. Johnson was alert and oriented. Even more pertinent with regard to the vocational issue, claimant was calm and cooperative. T. 434. He had a bright affect and exhibited goal oriented thought process. T. 434. Accordingly, the ALJ did not err in ultimately relying upon expert testimony that did not take into account the supposed "marked" limitations circled by Dr. Chalsani.

Plaintiff's claim that the ALJ did not obtain sufficient information about he physical and mental demands of the kitchen helper job also does not avail. The shortcoming of the argument is that it relies not on the details of the job in question, but upon acceptance of the Supplemental Questionnaire. The ALJ declined to accept the form, and this order has found no error in the ALJ's decision in that regard. In fact, Ms. Gillespie provided significant information concerning the kitchen helper position, noting, most importantly, that the job would be performed in a setting involving coworkers and a crew supervisor. T. 56. The record here contains substantial evidence of plaintiff's abilities to function in such a setting.

The actions of the Commissioner are supported by substantial evidence. No legal error has been show in the denial of benefits.

**ACCORDINGLY, it is ORDERED:**

1.  The decision of the defendant Commissioner is AFFIRMED and plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income are DENIED.

2.  The clerk is directed to close the file.

At Pensacola, Florida, this 13th day of February, 2014.

*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**